591 A.2d 743

**HOLT'S CIGAR COMPANY, Appellee,**

v.

**222 LIBERTY ASSOCIATES and Philip J. Banks, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 18, 1990.

Filed May 23, 1991.

Steven J. Cooperstein, Philadelphia, for appellants.

Louis S. Flocco, Philadelphia, for appellee.

Before DEL SOLE, POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

This is an appeal from judgment entered in the Philadelphia County Court of Common Pleas, sitting in equity, awarding appellee Holt's Cigar Co. ("Holt's" or "Lessee") liquidated and lost profits damages in the amounts of $22,000 and $53,716, respectively. The action was one for injunction and breach of commercial lease. Named defendants were appellant Philip J. Banks ("Banks") and 222 Liberty Associates (a Pennsylvania limited partnership) ("Liberty" or "Lessor"; collectively referred to as "appellant"). We reverse the chancellor and vacate the liquidated damages award finding it an unenforceable penalty; we also reverse and vacate the lost profits award on grounds that relief in the form of unliquidated damages was not pleaded by appellee thereby creating an impermissible variance between the *allegata* and the *probata*.

 Appellee Holt's is a Pennsylvania corporation with its principal place of business at 114 South 16th Street, Philadelphia, PA. It is at this location where appellee leased from Liberty commercial property in order to engage in the retail sale of various and sundry smoking products and accessories. As already indicated, Holt's complaint named 222 Liberty Associates and appellant, Philip J. Banks, as defendants. The complaint further averred (and this was admitted in defendants' answer) that Banks was a general partner and general contractor of 222 Liberty Asso-

ciates during the relevant time period. Complaint and Answer 2–3. Preliminarily, we find the law well-settled in that this admission is sufficient to impose joint and several liability on Philip Banks for any wrongful act made in the ordinary course of partnership business. *See* 15 Pa.C.S.A. §§ 8533(b), 8325 & 8327 (Purdon App.1990); *See also Rhodes v. Terheyden*, 272 Pa. 397, 116 A. 364 (1922).

On January 1, 1980, Holt's began a ten-year term lease at the above-mentioned address. This commercial lease was for corner space fronting Sansom and 16th Streets situate on the ground floor of a multi-story building. The dispute arose out of extensive building renovation efforts undertaken by appellant in the midst of Holt's tenancy (not at Holt's behest). The body of the chancellor's opinion is brief enough to be cited in full:

> This civil action in equity arose out of the defendant's performance of extensive renovations to a building in which plaintiff occupied ground floor space pursuant to a lease agreement dated December 31, 1989, [sic] and subsequent riders and addendums thereto. The lease agreement permitted the defendant landlord to conduct repair/renovation activities, however, plaintiff contended in its complaint and demonstrated at trial that the conduct of the defendant, its general partner and contractor, Philip Banks, its subcontractors and others, substantially interfered with and prevented the plaintiff from operating its business profitably. The conduct of the defendant can only be described as the total disregard of plaintiff's rights as a tenant and in certain cases, bordering on malicious activity. On two occasions, the plaintiff was forced to seek emergency relief in the Court of Common Pleas to force the defendant to provide heat to the leased premises. As [sic] one point, the defendant sought the eviction of the plaintiff but withdrew this request when Judge Gafni personally inspected the premises and permitted the plaintiff to escrow its rent to ensure the defendant's provided heat. A thorough review of the notes of testimony indicates the extent to which the

defendant interfered with plaintiff's business activities and totally disregarded the plaintiff's rights as a tenant.

The evidence indicated a liquidated damages provision agreed to by the parties which provided for a payment of $500.00 day where plaintiff was unable to conduct business as a result of defendant's construction activities. The parties stipulated at trial that the number of business days at issue was 44 [excluding days closed and holidays], although plaintiff contended there were 52 [including days closes and holidays]. Plaintiff also contended that it was entitled to damages for loss of profits during the period of defendant's business interruption and interference.

This Court found the testimony of the defendant, Philip Banks, to be incredible and highly suspect, while the testimony of plaintiff's witnesses was credible and worthy of belief. Based upon the testimony and documentary evidence submitted by the parties, the court entered a verdict for plaintiff in the total amount of $75,716.00, which represented per diem damages of $500.00 for 44 days, plus loss of profits in the amount of $53,716.00.

The defendant contended that the plaintiff failed to prove its case by a preponderance of the evidence and that a verdict against the defendant, Philip Banks, individually, was unwarranted and unsupported by the evidence. This Court, sitting without a jury, was free to assess the credibility of the witnesses and to accept or reject testimony presented. [citation omitted]. The fact that this Court did not believe the defendant, Philip Banks, or accept his version of the facts, does not render the evidence insufficient. Likewise, a complete review of the record in this case demonstrates the existence of substantial evidence to support the verdict in plaintiff's favor.... The verdict and judgment entered against [Banks] should stand accordingly.

Chancellor's Op. 1–4.

On September 18, 1986, over six years into the lease, the parties negotiated an "agreement" calling for a $500 per

diem stipulated sum to be paid appellee for delayed construction/renovation of the building.[1] Relevant portions of the agreement are as follows:

> September 18, 1986
> To: Mr. Philip Banks
> This will confirm our understanding regarding the construction work being done on the outside and inside of our store:
> 1. You have agreed that if you do not meet the construction schedule attached, you will pay us $500.00 per day for each day delayed. In addition, if we have to close the store, which is not contemplated, there will be an abatement of rent and $1,000.00 per day for each day that we are closed.
>
> . . .
>
> If you agree that the above is accurate, please sign a copy of this letter and return it to us.
> Very truly yours,
> /s/ Robert Levin[2]
> 222 Liberty Assoc.
> /s/ Philip J. Banks
> Philip Banks, general partner
> [unsigned]

### CONSTRUCTION SCHEDULE

1. Sansom Street (corner)
 - A. Cut opening remove radiator — 3 Day
 - B. Fill in plumb up — 2 Day
 - C. Temporary glaze — 2 Day
 - D. Place temporary door — 1 Day
2. 16th Street
 - A. Cut 2 openings — 5 day
 - B. Fill in plumb — 3 day
 - C. Temporary glaze — 2 day
 Permanent glaze (later) — 2 day
 - D. Place new doors — 1 day

---

1. While it is axiomatic that an agreement for liquidated damages must contain all elements of an enforceable contract, we express no opinion as to whether the agreement of September 18, 1986, is supported by mutual consideration. We note, however, that while appellant raised the issue of lack of consideration at the pleading stage, *see* Pa.R.C.P. 1030, no evidence or argument was offered at trial or in post-verdict motions on this point. Thus, appellant has failed to satisfy its burden of proof on this issue, *see In re Beeruk's Estate*, 429 Pa. 415, 241 A.2d 755 (1968), and the issue is deemed waived for purposes of further review.

 We also note that the lease agreement permits of subsequent alteration, amendment, change or addition by agreement in writing signed by the parties. R.R. at 11a.

2. Mr. Levin is part owner, president and an officer of Holt's. N.T. February 23, 1988, at 62.

3. Remove temporary glass doors 1 day
 Sansom St. replace with Temp.
4. Sansom St. smaller windows
 demolish (6)

 (a) 1½ pep
 opening
 (b) [illegible]

Plaintiff's exhibit 1.

Trial lasted for three days and filled 401 pages of transcript. On June 3, 1988, the chancellor issued the following uncaptioned notice of judgment in favor of appellees: "The court finds in favor of the plaintiff against the defendants 222 Liberty Associates & Philip J. Banks in the amount of $75,716." Appellant timely filed motions for post-trial relief on June 6, 1988, accompanied by a supporting memorandum. Relief was denied by order of October 4, 1988. Thereafter, upon praecipe, judgment was entered in favor of appellee on January 12, 1989, in the amount of $75,716 as against defendant Banks only. It was not until March 22, 1990, that the chancellor filed an opinion—apparently in response to appellant's notice of appeal to this court filed February 14, 1989.

■ Preliminarily, we note that despite one passing reference in the chancellor's opinion evidencing his recognition of this being an action in equity, the clear inference is that he was at all times operating under the mistaken belief that the rules of procedure governing actions at law applied.[3]

---

**3.** Nonetheless, we will consider the various labelling errors misnomers. The June 3, 1988, notice of judgment in favor of appellees served the purpose of a "decree nisi" insofar as it afforded appellant the opportunity to file post-trial motions. Similarly, the entry of judgment on January 12, 1989, substituted as a "final decree" from which this appeal was taken. *See Miller v. Miller,* 359 Pa.Super. 183, 518 A.2d 841, 842 n. 2 (1986) ("order" considered a misnomer for "decree").

While we also will consider the "opinion" of March 22, 1990, as an "adjudication," *see Houston–Starr v. Virginia Mansions Apartments, Inc.,* 295 Pa.Super. 480, 441 A.2d 1334, 1335 (1982) ("opinion" considered a misnomer for "adjudication"), the fact remains that the so-called adjudication was filed nearly two years *after* the so-called decree nisi in violation of Pa.R.C.P. 1517 ("The court shall make an adjudication [which] ... shall consist of ... a decree nisi."), and Pa.R.C.P. 227.1 ("Post-trial motions shall be filed within ten days *after*

The proof at trial bears this out, for while appellee's complaint requested both equitable and monetary relief in the form of liquidated damages,[4] the evidence at trial was

... (2) ... the filing of the ... adjudication in the case of a trial without a jury or equity trial.") (emphasis added). In this vein, we are also aware of a line of case precedent standing for the proposition that when certain rules of civil procedure governing actions in equity are sufficiently compromised (former Rules 1517–1519; current Rules 1517, 227.1, 227.2 and 227.4), the decree appealed from is a mere "nullity" and should be vacated *sua sponte* by an appellate court. *See, e.g., Community Sports, Inc. v. Oakland Oaks,* 429 Pa. 412, 240 A.2d 491, (1968); *Cooney v. Pennsylvania Osteopathic Association,* 434 Pa. 358, 253 A.2d 256 (1969); *Patrick & Wilkins Co. v. Adams,* 456 Pa. 566, 322 A.2d 341 (1974); *In re Involuntary Term of Parental Rights, etc.,* 487 Pa. 387, 409 A.2d 404 (1979); *Cornell v. D'Italia,* 287 Pa.Super. 233, 429 A.2d 1186 (1981); *Miller, supra; In re Adoption of Hamilton,* 362 Pa.Super. 249, 523 A.2d 1176 (1987). Significantly, the common thread running through each of these cases is procedural error, committed by the chancellor, depriving the litigants of the opportunity to file exceptions to what should have been an adjudication and decree nisi, and the opportunity to re-argue the issues before the chancellor or the trial court en banc.

The posture of the instant appeal is distinguishable inasmuch as appellant *Banks was afforded* the opportunity to move for post-trial relief in response to the notice of unfavorable judgment against him. In fact, post-trial motions were filed on June 6, 1988, and denied by order of October 4, 1988, which order further indicates that the chancellor heard argument on these motions (the hearing was not transcribed). Hence, appellant had ample opportunity below to request that the chancellor prepare an adjudication from which *more particularized* objections might have been made. With no such request, and in light of our disposition, we see no need to vacate the judgment and remand with instructions to prepare one anew. The substantial rights of the parties' have not been compromised. *See* Pa.R.C.P. 126 ("The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties."); *see also Rosenfeld v. Rosenfeld,* 390 Pa. 39, 133 A.2d 829, 835 (1957) ("The Chancellor should have prepared formal findings of fact and conclusions of law in compliance with Rule 1517 ... [w]e do not see, however, what could be gained by our remanding the case for that purpose.") (citations omitted).

4. The Complaint reads, in pertinent part:

21. Plaintiff has suffered and continues to suffer substantial interference with their business activities causing them great financial loss which loss is ongoing.

22. Plaintiff has no adequate remedy at law, and if Defendants are permitted to continue in their present course of action, Plaintiff will be irreparably harmed.

limited exclusively to a plea for monetary damages (both liquidated and lost profit). Indeed, equitable relief was unavailable in light of the fact that all renovation efforts ceased before trial. Nonetheless, once equity (subject matter) jurisdiction properly attached, jurisdiction to enter a monetary decree for liquidated damages continued even though no disposition was made of plaintiff's initial application for injunctive relief, see *Stryjewski v. Local Union No. 830, Brewery, Etc.*, 451 Pa. 550, 304 A.2d 463 (1973), and even though the alleged continuing harm ceased before trial. See *McGovern v. Spear*, 463 Pa. 269, 344 A.2d 826, 828 (1975). It has been said that a preliminary objection (either by defendant, or by the chancellor *sua sponte*) as to the existence of a full, complete and adequate non-statutory remedy at law, see Pa.R.C.P. 1509(c), goes to the form of the action, is not jurisdictional, and, therefore, can be waived. See *Carelli v. Lyter*, 430 Pa. 543, 244 A.2d 6, 8 (1968); *see also* Pa.R.C.P. 1509(c). No such preliminary objection was made below. Accordingly, the chancellor properly addressed appellee's claim for liquidated damages.

## LIQUIDATED DAMAGES AWARD

Appellant first contends that the $22,000 liquidated damages award must be reversed as the enforcement of a penalty. We agree.

■ Nearly a century ago our supreme court quite aptly articulated the policy against the enforcement of penalties in actions ex contractu:

[W]here the breach of agreement admits of compensation, the recovery may be limited to the loss actually sustained, notwithstanding a stipulation for a penalty. [This rule] is founded upon the principle that one party should not be

WHEREFORE, Plaintiff prays that judgment be entered against Defendants to enforce the agreement entered into by Defendants to meet construction schedules, to pay the per diem amount, to be enjoined form interfering with access to and use of the interior portion of the premises leased by Plaintiff, ... and whatever other equitable relief this Honorable Court deems appropriate.

allowed to profit by the default of the other, and that *compensation* and not forfeiture is the equitable rule. *Kunkel & Jordan v. Wherry*, 189 Pa. 198, 201, 42 A. 112 (1899) (emphasis added). Hence, the rule of validity of a liquidated damages stipulation was held to comport with the general and overarching principle of contract remedies—compensation for damages sustained. *See, e.g., Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 50 S.Ct. 142, 74 L.Ed. 382 (1930) (agreements to pay a fixed sum without any reasonable relation to probable damages for breach "tends to negative any notion that the parties really meant to provide a measure of compensation"); *see also Keck v. Bieber*, 148 Pa. 645, 646, 24 A. 170 (1892); *see generally* Restatement (Second) of Contracts, § 356 comment a. (noting centrality of the principle of compensation). Where a stipulated damages clause is intended as a form of punishment with the purpose, in terrorem, to secure compliance, the principles of compensation are subordinated and the provision must fail as an unenforceable penalty. *See In re Plywood Company of Pennsylvania*, 425 F.2d 151, 155 (3d Cir.1970) ("A penalty is said to be fixed not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.").

To assist in making this distinction, our courts have employed certain rules of construction that are commonly thought to provide the best indication of the parties' intent.

> The question [of whether stipulation is a penalty or a valid liquidated damages provision] ... is to be determined by the intention of the parties, drawn from the words of the whole contract, examined in the light of its subject-matter and its surroundings; and in this examination we must consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the several breaches provided against, the ease or difficulty of measuring a breach in damages, and such other matters as are legally or necessarily inherent in the transaction.

*Commonwealth v. Musser Forests, Inc.*, 394 Pa. 205, 146 A.2d 714, 717 (1959) (citing *March v. Allabough*, 103 Pa. 335, 341 (1883)); *see also Holmes Electric Protective Co. v. Goldstein*, 147 Pa.Super. 506, 24 A.2d 161, 165 (1942). This court also has cited with approval section 339 of the Restatement (First) of Contracts:

(1) An Agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for breach, unless

(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) the harm that is caused by the breach is incapable or very difficult of accurate estimation.

*See, e.g., Harris v. Dawson*, 239 Pa.Super. 316, 360 A.2d 706 (1976) (citing with approval § 399); *Kraft v. Michael*, 166 Pa.Super. 57, 70 A.2d 424 (1950) (same).

In light of the foregoing legal principles, conspicuously absent is any indication that the chancellor demonstrably considered whether the per diem stipulation was: (1) chosen due to the difficulties in proving with certainty the precise extent of actual damages for breach, and (2) whether the stipulated sum was agreed to and intended as a good faith pre-estimate of actual damages anticipated from delayed repairs.

We feel that it is incumbent on the trial judge to address these mixed factual and legal questions in the first instance prior to awarding liquidated damages lest we forget that compensation, not punishment, is the guiding rule. *See Keck v. Bieber*, 148 Pa. 645, 646, 24 A. 170 (1892) ("where [damages are stipulated to in advance] the court will always look into the question whether this is really liquidated damages or only a penalty, the presumption being that it is the latter"); *see also Holmes Electric Protective Co. v. Goldstein*, 147 Pa.Super. 506, 24 A.2d 161, 165 (1942) (same). While the final determination of whether a stipulated sum is for liquidated damages or a penalty is one of

law for the court to decide, *see Laughlin v. Baltalden, Inc.*, 191 Pa.Super. 611, 159 A.2d 26, 29 (1960), it should be remembered that the pleadings and evidence reduced to findings of fact supply the court with the information necessary to make informed legal conclusions. That the facts and circumstances of each case control suggests the importance of there being detailed findings made below.

Instantly, various avenues of inquiry were available to the chancellor which might have been of assistance in discerning the parties' intentions regarding liquidated damages. The chancellor might have examined the subject matter of the contract, particularly the nature and extent of the agreed-to repairs on the building, and the anticipated profits absent breach, to assess whether the stipulated sum was a reasonable pre-estimate of foreseeable damages due to delay. This would have been especially probative where, as here, the contract on its face was vague in its description of appellant's specific obligations thereunder. The court also might have appropriately chosen to consider the actual amount of damages suffered due to delayed construction relative to the stipulated sum, and, hence, whether the stipulation was so grossly disproportionate to actual damages as to afford appellee a windfall. Finally, we note that parole evidence of prior negotiations offered to describe the manner through which a liquidated damages provision was arrived at, *i.e.*, to explain the terms of a writing, is often probative of the parties' intent. Abundantly clear from the chancellor's opinion is that none of these avenues was investigated.

Nevertheless, we are able to glean from the record evidence which compels reversal of the liquidated damages award. Robert Levin testified at trial as to how he arrived at the $500 per diem amount included in the agreement:

We picked that [$500 per diem figure] because I had to pick some figure. We had to have some parameters within which the schedule had to be adhered to and if you went over the schedule there would have to be some sort of penalty. And we picked five hundred dollars a day,

and that seemed to be perfectly fine with everybody involved if they went over the schedule.

N.T. February 23, 1988, at 169. Moreover, it was Holt's contention at trial that the per diem amount was intended to apply even on days that Holt's was not open for business:

Of course, it's our contention as we made in the opening that we are counting seven days of the week; Holt's being open six days. But the five hundred dollar per day not being limited to business days.

N.T. February 25, 1988, at 280, 380. Lastly, and in an apparent attempt to recover both stipulated and lost profits damages, Holt's argued "that [the] contract of September 18, 1986 ... entitl[ed] the plaintiff to a five hundred dollar a day penalty, if you will, not liquidated damages...." [5] N.T. February 23, 1988, at 3; *see also* Brief for Appellee at 9 (noting that "the $22,000 is not a liquidated damage, and is separate and apart from the lost profit damages").

■ We find it abundantly clear from the trial testimony and accompanying arguments that Holt's, acting through Mr. Levin, chose the stipulated sum not as a reasonable forecast of anticipated damages due to delay, but rather solely as a penalty to discourage breach (delay). That the sum was chosen to insure "adherence" with the schedule, that appellee would construe it to apply even on days that the store ordinarily was closed for business, and that appellee repeatedly referred to, and contended that, the stipulation was a "penalty," clearly forecloses any claim that it was intended as a measure of compensation. Accordingly, we reverse and vacate the award of $22,000 finding the

5. To be sure, the terminology employed is not conclusive as to the construction given a stipulated sum, *see, e.g., Wedner v. Fidelity Sec. Systems, Inc.,* 228 Pa.Super. 67, 307 A.2d 429 (1972); *Kunkel & Jordan v. Wherry,* 189 Pa. 198, 201, 42 A. 112 (1899) (where party is to pay "the sum of $150 per day as a penalty for each and every day thereafter that the said work remains unfinished, as and for liquidated damages," court observed that "[t]he name by which it is called is of but slight weight...."), it may, however, be considered corroborative of the parties' intent as otherwise construed from the agreement.

liquidated damages stipulation penal in nature and unenforceable on grounds of public policy.[6]

## LOST PROFITS AWARD

In addition to liquidated damages, appellee recovered $53,716 in lost profits damages for breach of commercial lease. At trial, appellant's attorney responded to appellee's claim for loss of profits damages suggesting the existence of a variance between the *allegata* and the *probata*:

It is further contended by the plaintiffs that they are entitled to lost profits other than the stipulated damage calculation in the amendment to the lease. In fact, that is not pleaded in this complaint in equity. It's our conten-

6. A brief word of clarification is in order in response to my esteemed colleague's appeal that this court enforce penalty clauses. *See post* concurring and dissenting opinion, at 750. Aside from the fact that this approach blinks at over a century's worth of caselaw advanced by the courts of this jurisdiction, *see ante* at 747–748, more particularly, it departs from that which has always formed the cornerstone of contract damages—compensation. To be sure, it cannot be doubted that liquidated damages clauses often produce the incidental effect of "assur[ing] [that] construction work [is] completed within the time called for in [a] construction schedule," and that "this [acts as] an incentive ... to complete the work within the agreed upon time schedule[,]" *see post* at 750–751, we feel, however, that the law is quite definitive in that this cannot be the *intended purpose* of a stipulated damages clause regardless of the equality of the parties' "bargaining strengths and sophistication." *Id.* at 751.

To the extent the dissent can be taken to say that the benefits of enforcing penalty clauses, *even if they objectively approximate actual damages* (after-the-fact), exceed the burdens placed on modern commercial transactions if we do not, we feel that this not only ignores the parties' intentions, but also disserves the principles of compensation and, in fact, creates the wrong incentives for those negotiating stipulated damages provisions. Moreover, even where a stipulated damages clause is held invalid, this has never been found to prejudice one's right to prove actual damages.

Finally, while conceding the fact that our supreme court's recent expression on goodwill damages might enlighten the inquiry in the context of lost prospective profits, *see AM/PM Franchise v. Atlantic Richfield,* 526 Pa. 110, 584 A.2d 915 (1990), we see no logical, much less a "compelling" reason to apply its teachings in the context of stipulated damage awards. *See post* at 750–751. In sum, today we reaffirm this jurisdiction's policy of holding unenforceable those liquidated damages clauses intended as a penalty rather than as a measure of foreseeable business losses.

tion that this case for money damages is limited solely to the five hundred dollar a day liquidated damages clause. N.T. February 23, 1988, at 7. Later on at trial, appellant's attorney twice made similar objections:

Objection, your honor. For the record, I'm objecting to any introduction of any damages other than damages flowing from the five hundred dollar a day contract.

．　　．　　．　　．　　．

There is no claim for lost profits in the complaint or any other pleading. I don't know how I can respond to something that is not pled.

N.T. February 23, 1988, at 103, 182.

Appellant properly preserved in post-trial motions the issue of variance from the pleadings. *See* Motion for Post–Trial Relief at 2, and Memorandum in support thereof at 2. Clearly, appellant could have done no more to apprise the chancellor of the purported variance. *Cf. Ingrassia Const. Co., Inc. v. Walsh,* 337 Pa.Super. 58, 486 A.2d 478, 481 (1984), (failure to object to variance at trial is a waiver of the right to object to it thereafter); *see generally* 6 Std.Pa. Pract. § 33:14 (1982) (describing particular time and place for objection on grounds of variance).

The general policy demanding consistency between the *allegata* and the *probata* derives from the belief that absent prior notice of what an opponent intends to prove at trial, a party may be surprised at trial and thereby deprived of the opportunity to prepare an adequate defense. *See, e.g., Freer v. Parker,* 411 Pa. 346, 192 A.2d 348, 349 (1963); *Computer Print Systems, Inc. v. Lewis,* 281 Pa.Super. 240, 422 A.2d 148, 152 (1980). This policy against prejudicial surprise is furthered substantially under the principles embodied in Pa.R.C.P. 1021 requiring, *inter alia,* that the relief to which a party deems himself entitled be specified in the pleadings, and, more particularly, that a demand for unliquidated damages be specifically pleaded.[7]

7. Rule 1021 states, in pertinent part:

■ Instantly, it is clear that these legal principles have been compromised sufficiently to warrant reversal of the lost profits award. Plaintiff-appellee pleaded only an action for breach of agreement and claimed relief only in the form of liquidated damages. *See* Complaint at note 4 *supra.* Nowhere in the pleadings is there a claimed breach of commercial lease in a more general sense upon which a lost profits award might have been granted, nor is there a claim for unliquidated damages, *i.e.*, lost profits, in conformity with Rule 1021. We hold this to be a material variance from the pleadings and can find no indication from the pleadings or elsewhere to suggest that defendant-appellant had notice that such proof would be offered at trial. Accordingly, we reverse the chancellor and vacate the award for lost business profits.

Judgement reversed; the liquidated damages and lost profits awards are vacated.

DEL SOLE, J., files a concurring and dissenting opinion.

DEL SOLE, Judge, concurring and dissenting:

I agree with the majority that the pleadings failed to state a claimed breach of commercial lease upon which lost profits may have been awarded and therefore join that part of the opinion denying the claim for lost profits. However, I must dissent from that part of the opinion which denied Appellee the $22,000 liquidated damages award.

The majority embraced the position that the award represented the enforcement of a penalty. Although this may be true, I nevertheless would hold that the agreement should be enforced. This was an agreement freely entered into by

CLAIM FOR RELIEF. DETERMINATION OF AMOUNT IN CONTROVERSY

(a) Any pleading demanding relief shall specify the relief to which the party deems himself entitled. Relief in the alternative or of several different types, including an accounting, may be demanded.

(b) Any pleading demanding relief for unliquidated damages shall without claiming any specific sum set forth only whether the amount is or is not in excess of $10,000.

parties of substantially equal bargaining power, in order to assure the construction work was completed within the time called for in the construction schedule. In the event Appellant was unable to meet the construction schedule it agreed to pay Appellee $500 a day. This was an incentive for Appellant's to complete the work within the agreed upon time schedule. I note that this type of agreement has become standard in modern day business. The Pennsylvania Department of Transportation (PennDOT) enters into this type of contract agreement regularly. I can discern no reason why there should be a distinction in the enforceability of such agreements based upon whether it is a private agreement freely entered into by consenting parties or one entered into for the benefit of the public.

We also note the recent Pennsylvania Supreme Court case of *AM/PM Franchise v. Atlantic Richfield*, 526 Pa. 10, 584 A.2d 915 (1990), adopted the position that parties should be entitled to prove good will damages. The court stated that historically, Pennsylvania has disallowed recovery for loss of good will damages or prospective profits in breach of warranty cases. The court noted that good will damages had always been found to be too speculative to permit recovery. *See Michelin Tire Co. v. Schulz*, 295 Pa. 140, 145 A. 67 (1929). In the *AM/PM* case the court stated:

> ... we believe that the rationale for precluding prospective profits under the rubric of "too speculative" ignores the realities of the marketplace and the science of modern economics. We believe that claims for prospective profits should not be barred *ab initio*. Rather plaintiffs should be given an opportunity to set forth and attempt to prove their damages.

The court thus overruled *Michelin* to the extent it prohibited a plaintiff from alleging a claim for damage to good will as a matter of law.

While admittedly the *AM/PM* case is a commercial code case, I find the language to be compelling. This case signifies that Pennsylvania will look to modern day approaches in enforcing contracts where contractual agree-

ments are freely entered into. The realities of the marketplace should not be ignored. Appellee faced the very real danger of economic losses due to the renovation work being conducted by Appellants. This led to an agreement between the parties of a construction schedule, which if not lived up to by Appellants would lead to a payment of $500 a day to Appellee. The fact that this figure was arbitrarily chosen is irrelevant. The crucial aspect of the agreement is that it was entered into freely between parties of equal bargaining strengths and sophistication. Therefore, I would find this agreement is enforceable. I would further hold that the *per diem* amount to be paid by Appellants to Appellee was in lieu of any claim for lost profits.